IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

LISA JANEAN BARTH,
     Plaintiff,

vs.                       Case No.: 3:16cv712/EMT

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,
     Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

This case has been referred to the undersigned magistrate judge for disposition

pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the

parties' consent to magistrate judge jurisdiction (*see* ECF Nos. 7, 9). It is now before

the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for

review of a final decision of the Commissioner of the Social Security Administration

("Commissioner") denying Plaintiff's application for supplemental security income

("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned

that the findings of fact and determinations of the Commissioner are supported by

substantial evidence; thus, the decision of the Commissioner should be affirmed.

## I.    PROCEDURAL HISTORY

On October 25, 2012, Plaintiff filed an application for SSI and alleged therein disability beginning September 1, 2004 (tr. 11).[1] Her application was denied initially and on reconsideration, and thereafter she requested a hearing before an administrative law judge ("ALJ").  An initial hearing was held on July 25, 2014, and a second hearing was held on March 19, 2015 (*see* tr. 58, 43).  On June 2, 2015, the ALJ issued a decision in which he found Plaintiff "not disabled," as defined under the Act, at any time through the date of his decision (tr. 26–35).  The Appeals Council subsequently denied Plaintiff's request for review.  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).  This appeal followed.

## II.    FINDINGS OF THE ALJ

In denying Plaintiff's claim for SSI, the ALJ made the following relevant findings (*see* tr. 26–35):

---

[1] All references to "tr." refer to the transcript of Social Security Administration record filed on April 3, 2017 (ECF No. 11).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

Case No.: 3:16cv712/EMT

(a)     Plaintiff had not engaged in substantial gainful activity after October 25, 2012, the date she applied for SSI;

(b)     Plaintiff had the following severe impairments during the relevant period[2]:  chronic obstructive pulmonary disease, depression, and bipolar disorder;

(c)     Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(d)     Plaintiff had the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. § 416.967(c) "except in function by function terms." She could lift and/or carry 25 pounds frequently and 50 pounds occasionally, sit a total of 6 hours in an 8-hour workday, and stand/walk a total of 6 hours in an 8-hour workday.  She could understand, remember, and carry out instructions but was limited to performing simple, routine, and repetitive tasks.  Her ability to deal with changes in the work setting and to use judgment were limited to simple work-related decisions; and she could respond appropriately to supervisors, co-workers, and the public occasionally;

(e)     Plaintiff has no past relevant work;

(f)     Plaintiff was born on September 18, 1971, and was 41 years old—or, a "younger individual" aged between 18 and 49—on the date she applied for SSI;

(g)     Plaintiff has a limited education and is able to communicate in English;

(h)     Transferability of job skills is not an issue in this case because Plaintiff's past work is unskilled;

---

[2] The relevant period in this case is October 25, 2012 (the date Plaintiff applied for SSI) through June 2, 2015 (the date the ALJ issued his decision), even though Plaintiff alleges disability since September of 2004.  *See* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which she is both disabled and has an SSI application on file).

Case No.: 3:16cv712/EMT

(i) Considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed; therefore, she was not under a disability, as defined in the Act, during the relevant period.

## III. STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is

Case No.: 3:16cv712/EMT

more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); <u>Lewis</u>, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A). Pursuant to 20 C.F.R. § 416.920(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, she is not disabled.

2.      If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 416.912. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052

(11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    SUMMARY OF RELEVANT EVIDENCE[3]

A.    Plaintiff's Personal Background and Hearing Testimony

Plaintiff quit school in the eleventh grade and did not obtain a GED (tr. 60). In 2009, when she was approximately thirty-eight years of age, she began receiving mental health treatment at the Lakeview Center for symptoms including difficulty sleeping, depression, irritability, and mood swings (*see* ECF No. 13 at 2).

At her hearing held March 19, 2015, in response to a question from the ALJ about her activities of late, Plaintiff testified that she takes care of her three-year-old daughter and attends counseling on a weekly basis for "bipolar and depression, and schizophrenia . . . [and/or] schizo-affective disorder" and that she goes to Lakeview once every three months (tr. 44). She noted she had only recently been assessed with "schizo-affective disorder, bipolar type," in approximately February of 2015 (tr. 46). Plaintiff reported that she hears voices and sees things that are not there, noting that the hallucinations have been occurring for seven years, with the auditory

---

[3] The claims in this appeal center on Plaintiff's mental issues; thus, the court will do the same in summarizing the relevant evidence.

hallucinations occurring on a daily basis and the visual ones occurring once or twice a week (*id*.). Plaintiff additionally reported she suffers from depression and related symptoms, as well as frequent mood swings (tr. 47–48). As of the date of her hearing, Plaintiff had not been prescribed any medications targeted at the hallucinations, but she had been prescribed Latuda for her bipolar, Vistaril for her anxiety, and Celexa for her depression, although she stated that only the depression medication was effective (tr. 47, 49–50).

Continuing, Plaintiff testified that she leaves her house only about two to three times a week for things such as grocery shopping or walking, noting that she limits her outings due to her inability to get along with people and her tendency to anger quickly and argue with others (tr. 48). Plaintiff stated the Latuda was not working because in the past two to three weeks she found herself becoming agitated very easily, even with her daughter, and that had not happened before (tr. 50). Plaintiff further testified that she gets "real depressed," wants to hurt herself, and actually had tried to do so by stabbing herself in February of 2014, which resulted in a voluntary hospitalization (*see id*.). Plaintiff also stated that sometimes she is too depressed to get out of bed, shower, or get dressed, and that she feels worthless (tr. 46–47). She testified that she previously had "a real bad drinking problem" but has not used

alcohol since her hospitalization except for "two little shots" on New Years Eve; she

also stated she has not smoked marijuana since her hospitalization (tr. 44, 50–51).[4]

B.     Plaintiff's History of Mental Health Treatment

(1)     Evidence that Pre-dates the Relevant Period

Plaintiff presented to the Lakeview Center on various occasions between 2009

and 2011, as well as in 2012, prior to the commencement of the relevant period on

---

[4] As summarized by Plaintiff, at her first hearing before the ALJ, held July 25, 2014, she testified that:

> she had been fired from her most recent job because of her angry outbursts towards her boss. She had trouble dealing with people and had anger issues. Tr. 63. Plaintiff did not have and had never had a driver's license [though she stated she has never wanted one (Tr. 627)]. Tr. 64. She was depressed and had thoughts of suicide. Tr. 68. Plaintiff described good and bad days with her mental health symptoms. She had mood swings. At one time she threatened to kill her ex-husband. Tr. 69. She threatened an old boss with a mop handle. She had been fired multiple times for angry and violent episodes. Tr. 70. Plaintiff had 3 to 4 angry spells each week, even when she took her medications. She had poor concentration. Tr. 71. Plaintiff was in special education classes in school. She was easily distracted. Tr. 72. She had auditory and visual hallucinations. She sometimes could not get out of bed because she was so depressed. Tr. 73. Plaintiff's auditory hallucinations sometimes told her to hurt herself or others. Tr. 74.

(ECF No. 13 at 6–7). At this initial hearing Plaintiff also testified that her medications were helpful as to some of her conditions (*see* tr. 64 (noting that the medications for her depression, bipolar, and anxiety "help[ed] control [her] symptoms"); tr. 68 (stating, similarly, that medication "help[ed]" her depression)). But they were not as helpful with respect to her anger issues, although she noted those issues would be worse without medication (*see* tr. 70–71). After this initial hearing, the ALJ referred Plaintiff for a consultative psychological evaluation (*see* tr. 74–75). The ALJ conducted the second hearing after the evaluation.

Case No.: 3:16cv712/EMT

October 25, 2012.  Records from this time frame show that Plaintiff was assessed

with GAF scores of 58 and 60[5] and was treated for or assessed with bipolar disorder,

type 1 and 2, depression, and other mental health issues or symptoms (*see, e.g.*, tr.

419, 427, 460).  Plaintiff was prescribed various medications, including Lexapro,

Risperdal, Vistaril, Abilify, and Zoloft (*see, e.g.*, tr. 367–68, 371–72, 427, 444, 450,

453).  In May 2011, Plaintiff reported she had recently learned she was pregnant, so

she discontinued all of her psychotropic medications and was "excited" about the fact

that, without the medications, her mood was stable and she was sleeping well (tr.

430).  A mental status examination conducted on May 19, 2011, revealed normal

speech, "more concrete" thought processes, appropriate affect, and full orientation

with no psychotic symptoms and no suicidal/homicidal ideation, intent, or plan (*id.*).

At a follow-up appointment four months later, on September 16, 2011, Plaintiff stated

she had remained off of her medications and that "her mood overall ha[d] been stable

without [them]" (tr. 435).  Lakeview clinicians reported the following:

---

[5] Global assessment of functioning, or "GAF," is the overall level at which an individual functions, including social, occupational, academic, and other areas of personal performance. American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 30–32 (4th ed. 1994).  It may be expressed as a numerical score. *Id.* at 32.  A score between 51 and 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

Case No.: 3:16cv712/EMT

> Speech is spontaneous and coherent. She responds with short answers. Thought processes are concrete. She describes her mood as good, without mood swings, pressured speech, or grandiose thinking. Affect is appropriate. She denies psychotic symptoms, suicidal or homicidal ideation, intent, or plan. She is alert and oriented in all spheres and has the mental capacity to consent for outpatient treatment.

(tr. 435, treatment record dated 9/16/11). A GAF score of 61 was assessed (tr. 436).[6]

Plaintiff returned to Lakeview in December 2011, just days after her child was born, and stated she wished to restart her medications because she was mildly depressed, noting that previously the medications had been "effective in maintaining mood stability," and they (i.e., Risperdal, Vistaril, and Zoloft) caused no side effects (tr. 439). Her medications were restarted, but Plaintiff failed to appear for follow-up "medication management" appointments on January 13 and 24, 2012 (tr. 442–43). When Plaintiff next returned to Lakeview, on June 28, 2012, she reported worsening symptoms and issues with the Risperdal (tr. 444). Her medications were adjusted.

Plaintiff was voluntarily hospitalized from July 6–9, 2012, after reporting non-command and command auditory hallucinations (including ones telling her to hurt herself), multiple personalities, depressed mood, feeling suicidal, and having

---

[6] A GAF score between 61 and 70 reflects some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994).

Case No.: 3:16cv712/EMT

difficulty adjusting to the recent changes that had been made to her medications (*see* tr. 367, 449, 576). Plaintiff was greatly improved upon her discharge on July 9, having reported an improved mood, feeling better, no auditory hallucinations, and no medication side effects (*see* tr. 368, 370). Her GAF score was increased from a 50, at the time of admission, to a 70 upon her discharge (tr. 371, 367),[7] and Plaintiff was advised to follow up at Lakeview in late September 2012 (*see* tr. 369).

(2)    Evidence from Within the Relevant Period

The next record from Lakeview is dated November 13, 2012, or about three weeks after the commencement of the relevant period, and about a month or so beyond the date Plaintiff was advised to follow up (tr. 453). Plaintiff advised ARNP Cheryl Pawloski that she had run out of Zoloft three days prior and since that time had become increasingly depressed with some suicidal thoughts but no plan (*id*.). A mental status examination was unremarkable (*see id*.). Plaintiff's medications were adjusted and she was advised to follow up in January 2013 (tr. 454).

---

[7] A GAF score between 41 and 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994). A score of 70 equates to mild symptoms, as noted above.

Plaintiff did not return to Lakeview until April 26, 2013, at which time ARNP Pawloski emphasized the importance of Plaintiff coming in on a regular basis so her medications could be managed (tr. 572). Ms. Pawloski noted Plaintiff's report that she had run out of her medications, which resulted in Plaintiff "constantly having mood swings and irritability" (*id*.). Plaintiff also stated she was still occasionally hearing voices, so her medications were adjusted (tr. 572–73). Plaintiff displayed some psychomotor agitation and reported her mood was "not good" (tr. 572). As far as affect, she was described as having "labile facial expressions"; Plaintiff denied any thoughts of harming herself (*id*.). Her speech was fluent, eye contact was direct, thought processes were goal directed and concrete, and insight and judgment were fair (*id*.). Plaintiff's diagnoses remained the same (bipolar disorder, type 1, most recent episode unspecified; cannabis abuse, sustained full remission), and she was advised to follow up in one month (tr. 573).

Plaintiff returned to Lakeview more than two months later, on July 2, 2013 (tr. 570). She acknowledged she had missed her last appointment, initially claiming her truck was not working but then stating she had forgotten about the appointment (*id*.). She stated two of her medications were working "very well," and she had less depression and less anxiety, although she reported she continued to hear voices (*id*.).

A mental status examination revealed essentially the same results as those obtained at her last appointment in April 2013 (*see id*.). Plaintiff was advised to return to Lakeview in four months, or earlier "should there be any problems" (tr. 571).

Approximately eight months later, on February 28, 2014, Plaintiff presented to Lakeview and advised the clinician, Kimberly M. Hennessee, M.A., that she was overwhelmed and suicidal (tr. 561). She also stated that her medications were not working and she reported increased agitation (tr. 561–62). She further stated she had been avoiding her family so she would not hurt them, noting that auditory hallucinations had been telling Plaintiff to hurt herself and others (tr. 562). Ms. Hennessee concluded that Plaintiff was in "a depressive state of bipolar disorder" and should be observed, evaluated, and stabilized (tr. 563). Plaintiff was voluntarily admitted to the hospital for psychiatric treatment through March 4, 2014 (*see* tr. 550). Although Plaintiff denied using any drugs, a urine drug screen was positive for THC (tr. 558). Upon her discharge, Plaintiff was generally "improved"; her mood and affect were noted to be neutral and her insight and judgment fair; and she was described as calm, cooperative, and stable, with no suicidal or homicidal ideation or plan (tr. 550, 554). Appointments were scheduled for Plaintiff to attend a transition

group therapy session ten days later on March 14, and outpatient psychiatric care at Lakeview on April 10 (tr. 554).

Plaintiff kept her appointment of April 10, 2014, and was seen by ARNP Leif Sternung (tr. 547).[8]  Plaintiff was stable and functioning well, and both she and her husband agreed that she was on the "right medication" (*id.*).  Her diagnoses were the same with respect to cannabis abuse (i.e., sustained full remission) and bipolar disorder (i.e., type 1, most recent episode unspecified), but she was additionally diagnosed with bipolar disorder, type 1, most recent episode depressed, severe, with psychotic features, as well as bipolar disorder, type 2 (*id.*).  It was noted that her hospitalization in late February was due in part to "bizarre behaviors" (tr. 667, 671). Plaintiff was advised to return in two to four weeks (*see* tr. 548).

Plaintiff returned to Lakeview three months later, on July 9, 2014 (tr. 624). She reported that since her prior appointment in April, she had been doing well on her medications and that her mood and behaviors had been stable (*id.*).  She additionally reported there had been no hallucinations, no delusions, no aggression, and no out-of-control behaviors (*id.*).  A mental status examination was unremarkable (*see id.*).  Her

---

[8] Plaintiff did not attend transition group therapy on March 14 (*see* tr. 549, 554), even though she signed a document indicating her agreement to participate in this group therapy (tr. 686), and a physician or other clinician had indicated that such was "medically necessary and appropriate to [Plaintiff's] conditions and diagnosis" (tr. 688).

medication regimen was continued, as it was controlling Plaintiff's symptoms and appeared as though it would prevent a relapse (tr. 625).  Plaintiff was advised to return in two to three months, unless her condition deteriorated before then (*id.*).

Plaintiff returned for treatment four months later, on November 6, 2014 (tr. 645).  She reported some "breakthrough symptoms," including auditory and visual hallucinations and feelings of paranoia (*id.*).  She stated her medications were not as effective as before (*id.*).  A mental status examination was largely unremarkable (*see id.*).  Adjustments were made to Plaintiff's medications, and she was advised to return in two to three months (tr. 646).

Plaintiff returned to Lakeview within the recommended time-frame, presenting for a follow-up appointment on January 23, 2015 (tr. 648).  She reported "doing a lot better with hallucinations and paranoia, but . . . feeling more depressed, withdrawn and crying" (*id.*).  She had no suicidal thoughts or plans but did report having thoughts of self-harming/scratching herself when she felt down or depressed (*id.*).  A mental status examination was largely unremarkable (*see id.*).  Adjustments were made to Plaintiff's medications, including an increase in the Celexa dosage (tr. 649).

On February 9, 2015 Plaintiff presented to a different branch of the Lakeview Center to establish treatment there, as she had recently moved (tr. 651).  Samantha

Lyons, M.A., recorded Plaintiff's report that her depression had worsened over the past few months (tr. 652). Plaintiff also reported an erratic sleep pattern, auditory and visual hallucinations, and some occasional manic episodes with racing thoughts, though she stated the last manic episode was about two months prior (tr. 652, 657). Plaintiff noted she also had anxiety but stated it did not interfere with her ability to function (tr. 652). Plaintiff provided that her medications had been helpful since the increased dosage of Celexa (*id.*). A mental status examination revealed the following: appropriate appearance, depressed affect and mood, intact memory, normal motor activities, eye-contact made (as opposed to avoided), normal speech, cooperative behavior, fair attention and concentration, average intellect, fair judgment, moderate insight, full orientation, no delusions, logical and coherent though processes, and normal/unremarkable thought content (tr. 656–58). Ms. Lyons opined that Plaintiff was at a low risk for suicide/homicide, and she assessed schizoaffective disorder, bipolar type, and a GAF score of 58 (tr. 658–60).[9]

Finally, the file contains numerous records from the Escambia Community Clinic, where Plaintiff was treated near or during the relevant period for various physical conditions. Although these records are largely irrelevant to the issues raised in this case, it is worth noting that they often mention Plaintiff's mental health

---

[9] There are no mental health treatment records in the file beyond February 9, 2015.

diagnoses but consistently note a normal mental state and/or appropriate affect (*see, e.g.*, tr. 490, 493, 495 (appropriate affect); tr. 497, 499, 501 (alert, cooperative, and oriented)). The same is true with records from the Santa Rosa Community Clinic (*see, e.g.*, tr. 514, 521, 640 (normal voice, alert, cooperative, and oriented); tr. 527, 538 (normal mental status); tr. 531, 534 (alert, fully oriented)) and with various emergency room records (*see, e.g.*, tr. 331 ("negative psychiatric review of systems"); tr. 379, 381, 388, 390 (normal affect, normal mood, alert, and/or fully oriented)).

C.     Other Information in Plaintiff's Claims File

(1)     Opinions of Treating ARNP with Lakeview

On December 10, 2012, ARNP Pawloski completed a statement in which she described Plaintiff's mood as "depressed" and her affect as "with constricted expressions" (tr. 479). Ms. Pawloski found Plaintiff's thought processes to be goal directed and concrete with no delusions or suicidal/homicidal ideation (tr. 480). Plaintiff was fully alert and oriented; her immediate, recent, and remote memory were intact; and her concentration was "good" (*id*.). ARNP Pawloski noted that Plaintiff currently had no auditory or visual hallucinations but that Plaintiff stated she had hallucinations when she was either not on her medications or when they needed management/adjustment (*see id*.). ARNP Pawloski assessed Plaintiff with bipolar disorder, type 2, most recent episode mixed, and cannabis abuse, in reported

remission (tr. 479–80).  She also opined that Plaintiff would be able to manage her own funds so long as she abstained from drugs and alcohol (tr. 481).  Ms. Pawloski made additional observations, as follows: (1) regarding what Plaintiff can still do despite her impairments, "[Plaintiff] requires medication management to cope with mood instability. [Her] mood disability interferes with activities of daily living."; and (2) regarding whether Plaintiff can work a full-time job, "Activity as such may be difficult.  [Plaintiff's] mood disability tends to work in a cyclical pattern and despite medication management symptoms may occur." (*id*.).  Last, ARNP Pawloski opined that Plaintiff's mood instability interfered with her ability to perform activities of daily living and that work activity on a sustained, full-time basis would be difficult due to the cyclical nature of Plaintiff's mood disorder, which persisted in causing symptoms despite medication management (*id*.).

(2)    Opinions of Consultative Examiner

As noted above, following her first hearing before the ALJ, Plaintiff was referred for a consultative psychological examination.  This was conducted by Susan A. Danahy, Ph.D., on August 25, 2014 (*see* tr. 627).  Plaintiff reported having "a major attitude problem with authority" and stated she had gotten into a dispute with her brother-in-law the previous evening (tr. 627).  She also reported auditory hallucinations and stated they were a "major problem" (tr. 627–28).  Dr. Danahy

noted that despite these reports, Plaintiff had never been arrested and nothing that Dr. Dahany observed suggested a "thought disorder, including hallucinations and delusions" (tr. 629).

A mental status examination was largely unremarkable and led Dr. Danahy to conclude both that Plaintiff's mental status was "generally intact" and that "[o]verall, mental status would be consistent with slightly less than average intellectual functioning and some difficulty with attention and concentration" (*see* tr. 634, 629). Dr. Danahy administered the WAIS-IV to Plaintiff, which resulted in a full scale IQ score of 70 (representing a borderline range) and, correspondingly, in Dr. Danahy's opinion, a limit to unskilled or semiskilled work, "probably . . . occupations involving manual labor" with no more than simple, non-complicated written instructions or information (*see* tr. 631).

In pertinent part, Dr. Danahy assessed bipolar disorder, ADHD by history, nicotine dependence, and history of alcohol abuse (Axis I); personality disorder, not otherwise specified (provisional), and borderline intellectual functioning (Axis II); and a GAF score of 53 (Axis V) (tr. 632). Dr. Danahy noted that although Plaintiff attributed her poor anger management skills to her bipolar disorder, this issue was more likely to be "Axis II in nature" and thus not related to the bipolar (*see* tr. 633). Last, Dr. Danahy completed a medical source statement regarding Plaintiff's mental

ability to perform work-related activities (tr. 634–36). Dr. Danahy opined that Plaintiff had no limitations regarding simple instructions and simple work-related decisions; mild limitations in understanding, remembering, and carrying out complex instructions; and mild to moderate limitations in making judgments on complex work-related decisions (tr. 634). Dr. Danahy noted that she based these mild or mild to moderate limitations only on Plaintiff's full score IQ score of 70 (*id.*). Dr. Danahy additionally assessed moderate to marked limitations in all areas relating to Plaintiff's ability to interact appropriately with the public, supervisors, and coworkers and to respond appropriately to usual work situations and to changes in a routine work setting (tr. 635). Dr. Danahy noted that these moderate to marked limitations were "based on [Plaintiff's] history alone," noting that Plaintiff was pleasant and cooperative during the evaluation, which appeared to be in contrast to her reports of poor anger control and rapid mood swings (*see id.*), though Dr. Danahy did note that Plaintiff had recently been hospitalized "with bizarre behavior" (tr. 635). She also noted Plaintiff's denial of "substance abuse [for] many years" (*id.*).

D.     Testimony Vocational Expert ("VE") James N. Cowart

At Plaintiff's hearing held March 19, 2015, VE Cowart testified that an individual with Plaintiff's RFC could perform the jobs of meat clerk, stubber, and rural mail carrier, and that numerous such jobs were available (tr. 52–53). Plaintiff's

counsel then asked VE Cowart to consider same hypothetical individual, but with marked limitations: (1) in interacting appropriately with the public, supervisors, and coworkers; and (2) in responding appropriately to usual work situations and changes in routine work settings (tr. 53–54). The VE testified that such a person would be precluded from all work (tr. 54).

V.    DISCUSSION

Plaintiff contends the ALJ erred in failing to find that her borderline intellectual functioning met or equaled the criteria of Listing 12.05C. Plaintiff also contends the ALJ erred in weighing the opinions of Dr. Danahy and in evaluating Plaintiff's credibility, both of which errors resulted in a flawed RFC determination. Last, Plaintiff contends the ALJ erred at Step 5 in various ways, including by relying upon the VE's testimony because his testimony was based upon incomplete hypothetical questions.

A.    Listing 12.05C

To meet Listing 12.05 ("intellectual disability"), "a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997). These three requirements are referred to as the Listing's "diagnostic description." 20 C.F.R. Pt.

404, Subpt. P, App'x 1, § 12.00 ("Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability.").[10] In addition to satisfying the diagnostic description, a claimant must meet one of the four sets of diagnostic criteria in paragraphs A through D of the listing. *Id*. Under paragraph C, a claimant must show: (1) "[a] valid verbal, performance, or full scale IQ of 60 through 70"; and 2) "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.05C.

A valid IQ score of 60 to 70 creates a rebuttable presumption that the claimant manifested "a fairly constant IQ throughout [the claimant's] life." Hodges v. Barnhart, 276 F.3d 1265, 1268 (11th Cir. 2001). Thus, "a claimant who shows that his IQ is in the range of 60 through 70 and that he has a 'physical or other mental impairment imposing an additional and significant work-related limitation of function' has satisfied the requirements of Listing 12.05C unless the Commissioner can rebut the Hodges presumption." Rudolph v. Comm'r, Soc. Sec. Admin., 709 F. App'x. 930, 933 (11th Cir. 2017) (citation omitted). The Hodges presumption may

---

[10] Although Listing 12.05 has been amended since the ALJ issued his decision, the undersigned will apply Listing 12.05C as it read on the date of the ALJ's decision. *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138, 66138 n.1, 66167 (Sept. 26, 2016) (amending Listing 12.05 and noting that the Social Security Administration "expect[s] the Federal courts will review [its] final decisions using the rules that were in effect at the time [it] issued the decisions").

be rebutted "where the IQ score is inconsistent with other evidence in the record on the claimant's daily activities and behavior." Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (citing Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986)); *see also* Hodges, 276 F.3d at 1269 ("[T]he Commissioner may present evidence of Hodges' daily life to rebut this presumption of mental impairment.").

Although the ALJ here did not explicitly address Plaintiff's impairment under Listing 12.05C, he implicitly found that Plaintiff did not meet the criteria because his inquiry extended into the fourth and fifth steps of the disability analysis. *See* Hutchinson v. Bowen, 787 F.2d 1461, 1463 (11th Cir. 1986) ("[T]he ALJ, in reaching the fourth and fifth steps of the disability analysis, implicitly found that appellant did not meet any of the Appendix 1 impairments."); Edwards v. Heckler, 736 F.2d 625, 629 (11th Cir. 1984) (while Appendix 1 must be considered in making a disability determination, it is not required that the Commissioner mechanically recite the evidence leading to his determination; there may be an implied finding that a claimant does not meet a listing). What is more, the ALJ's implicit finding here is supported by substantial evidence.

First, the medical record rebuts the presumption that Plaintiff had the requisite mental impairment. Although Plaintiff had one full IQ score at the high end of the 60 to 70 range when she was tested by Dr. Danahy in August of 2014, the medical

record does not show that Plaintiff was ever diagnosed with an intellectual disability. This lack of diagnosis provides substantial evidence that Plaintiff's impairment did not fulfill the criteria for Listing 12.05C. *See, e.g.*, Smith v. Comm'r of Soc. Sec., 535 F. App'x 894, 897–98 (11th Cir. 2013) ("The fact that none of the other treatment records diagnosed [the claimant] with [intellectual disability] supports the ALJ's rejection of the IQ test results and supports the conclusion that [the claimant] did not meet or equal the criteria of Listing 12.05(C)."). Furthermore, Dr. Danahy assessed Plaintiff with borderline intellectual functioning (ECF No. 632), which is "mutually exclusive of [intellectual disability, formally known as] mental retardation." Jordan v. Comm'r of Soc. Sec., 470 F. App'x 766, 769–70 (11th Cir. 2012).[11]

Second, Plaintiff's daily activities and behavior also rebut the presumption that she had the requisite mental impairment. The ALJ found that Plaintiff had only mild restrictions in activities of daily living (tr. 29), and this finding is supported by the record. As the ALJ noted, Plaintiff was:

> completely independent with all activities of daily living, including caring for her infant daughter with dressing, feeding and bathing the child; as well as herself. [Plaintiff] could prepare meals, follow a few step instructions, use public transportation, shop for groceries and

---

[11] Effective September 3, 2013, the Social Security Administration replaced the term mental retardation with the term intellectual disability as a listed impairment. Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46499-01 (Aug. 1, 2013) (to be codified at 20 C.F.R. Pt. 404, Subpt. P, App. 1).

clothing, and could pay for items and household bills independently. She also cleaned and performed household chores . . . .   [She also] socializes with friends and family . . . .

(tr. 29; *see also* tr. 61–65, 80).

Third, neither Plaintiff nor her attorney asserted that she was disabled on the basis of intellectual disability prior to or during her administrative hearings, including during the hearing that followed Dr. Dahany's examination and IQ testing.  *See* Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996) (holding that a claimant's failure to list an impairment, either in her application for disability benefits or through her testimony, disposes of the claim, because the ALJ was under no "obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability").

Finally, Plaintiff generally failed to meet her burden of proving that her mental impairment met or equaled the requirements of the Listing.  Though she testified about challenges she encountered in school, she presented no documents or other corroborating evidence establishing that she had deficits in adaptive behavior that manifested before the age of twenty-two.  *Cf.* Rudolph, 709 F. App'x. at 932 (ALJ erred in failing to apply Hodges presumption or discuss whether it had been rebutted, where valid full scale IQ score of 70 existed and claimant supplied evidence showing he was mentally disabled during his school years, including records showing that in

second grade he received the lowest possible score on an Alabama standardized reading and writing test, and that he was then held back to repeat second grade, and where he called an expert witness who interpreted those school records in a manner favorable to his claim).

In sum, considering all of the foregoing factors together, this court finds that the ALJ implicitly considered Plaintiff's mental impairment under Listing 12.05C and determined that Plaintiff did not meet the diagnostic criteria.[12]  The court further finds that the ALJ's determination is supported by substantial evidence in the record as a whole and, correspondingly, that Plaintiff is not entitled to relief on this claim.

B.      The Opinions of Dr. Danahy

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions."  20 C.F.R. § 416.927(a)(1).  Absent "good cause," an ALJ is to give the medical opinions of treating physicians "substantial or considerable weight."  Lewis, 125 F.3d at 1440; *see also* 20 C.F.R.

---

[12] It should be noted that the ALJ thoroughly discussed Dr. Danahy's examination, including the "Full Scale IQ score of 70" and the fact that it placed Plaintiff "in the Borderline range of intelligence" (*see* tr. 29, 32, 33).  He thus was obviously aware of the score and diagnosis.

§ 416.927(c)(1)–(2).  Good cause exists "when the: (1) treating physician's opinion

was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3)

treating physician's opinion was conclusory or inconsistent with the doctor's own

medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004).  With

good cause, an ALJ may disregard a treating physician's opinion, but he "must clearly

articulate [the] reasons" for doing so.  Id. at 1240–41.

Additionally, an ALJ must state with particularity the weight given to different

medical opinions and the reasons therefor.  Sharfarz v. Bowen, 825 F.2d 278, 279

(11th Cir. 1987) (per curiam).  "In the absence of such a statement, it is impossible

for a reviewing court to determine whether the ultimate decision on the merits of the

claim is rational and supported by substantial evidence."  Cowart v. Schweiker, 662

F.2d 731, 735 (11th Cir. 1981).  Therefore, when the ALJ fails to "state with at least

some measure of clarity the grounds for his decision," the court should not affirm

"simply because some rationale might have supported the ALJ's conclusion."  Owens

v. Heckler, 748 F.2d 1511, 1516 (11th Cir. 1984) (per curiam).  In such a situation,

"to say that [the ALJ's] decision is supported by substantial evidence approaches an

abdication of the court's duty to scrutinize the record as a whole to determine whether

the conclusions reached are rational."  Cowart, 662 F.2d at 735 (quoting Stawls v.

Califano, 596 F.2d 1209, 1213 (4th Cir. 1979)) (internal quotation marks omitted).

Here, there is no "treating physician" opinion at issue, as Plaintiff was primarily treated by nurses and other clinicians at the Lakeview Center. It is perhaps due to this void in the record that the ALJ referred Plaintiff to Dr. Danahy for a consultative psychological evaluation. Thereafter, the ALJ carefully considered and thoroughly discussed Dr. Danahy's report and findings, ultimately deciding to assign "great weight" to her findings (tr. 32). Plaintiff takes issue with the ALJ's decision in this regard, however.

While not entirely clear, Plaintiff seems to suggest that the ALJ did not in fact assign great weight to Dr. Danahy's opinions because Dr. Danahy assessed "*moderate to marked*" limitations in Plaintiff's ability to interact appropriately with the public, supervisors, and coworkers, but the ALJ included only *occasional* contact with supervisors, co-workers, and the public in Plaintiff's RFC, not marked limitations in these areas (*see* tr. 30).

The court finds no error. Dr. Danahy filled out a pre-printed "check-off" form that had boxes on it, where she was to mark boxes indicating none, mild, moderate, marked, or extreme limitations in the work-related functional areas just noted. She checked *both* the moderate and marked boxes in each area, and drew a horizontal line between the two boxes in each area, evidently indicating that Plaintiff fell at the end of or within the range of both limitations (*see* tr. 635).

It is clear that the ALJ adopted that part of Dr. Danahy's opinions which assessed limitations at the lower end of the moderate to marked range.[13] His decision to do so is consistent with his statement that he was assigning "great weight"—but not total weight—to the opinions of Dr. Danahy. His decision to do so is also consistent with the evidence of record, including Plaintiff's daily activities. Furthermore, as the ALJ noted, Dr. Danahy specifically stated that the moderate to marked limitations she assessed were based primarily on Plaintiff's self-reported history (*see* tr. 33, 635).[14] The ALJ also pointed to the other findings of Dr. Danahy that Plaintiff could perform work, as well as Dr. Danahy's observations that Plaintiff's mental status was generally intact and that Plaintiff was able to follow all test instructions—opinions and observations which are inconsistent with marked or disabling functional limitations (*see* tr. 33).

---

[13] The form completed by Dr. Danahy defined the five available choices, in relevant part, as follows: (1) None — "Absent or minimal limitations"; (2) Mild — "There is slight limitation in this area, but the individual can generally function well"; (3) Moderate — "There is more than a slight limitation in this area, but the individual is still able to function satisfactorily"; (4) Marked —"There is serious limitation in this area. There is a substantial loss in the ability to function effectively"; and (5) Extreme — "There is major limitation in this area. There is no useful ability to function in this area." Based on these definitions, the undersigned finds *moderate* limitations, as assessed by Dr. Danahy, to be largely consistent with *occasional* limitations, as assessed by the ALJ.

[14] As discussed more fully below, the ALJ found Plaintiff less than fully credible, and his findings in that regard are supported by the record.

Plaintiff goes on to argue that the ALJ erred at Step 5 because the VE's testimony in response to a question by Plaintiff's counsel established that a person with the limitations "as described by Dr. Danahy would not be able to sustain competitive employment" (ECF No. 13 at 9). Plaintiff's argument misses the mark. The VE was asked whether someone with *marked* limitations in the functional areas previously discussed could perform work (tr. 53–54), but as just discussed, Dr. Dahany opined that Plaintiff had moderate to marked limitations, not simply marked limitations as counsel stated in his question, and the ALJ properly adopted only that part of Dr. Danahy's opinion which assessed occasional limitations in the functional areas at issue. Thus, the ALJ did not err at Step 5, as the question posed to the VE *by Plaintiff's counsel* failed to accurately reflect Plaintiff's limitations as determined by the ALJ.

Finally, to the extent the opinions of ARNP Pawloski conflict with those of Dr. Danahy, the ALJ was permitted to adopt those of Dr. Danahy over those of Ms. Pawloski. *See* SSR 06–03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) (the opinion of a nurse practitioner is not a "medical opinion" or a treating source and is not entitled to controlling weight or significance).

C.    Credibility Findings

Here, in considering Plaintiff's credibility, the ALJ first made reference to 20 C.F.R. § 416.929, which contains the same language interpreted by the Eleventh Circuit in establishing the three-part pain standard (tr. 30). The ALJ then recited the standard (*id*.). *See, e.g.*, Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (the three-part standard requires the claimant to show "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise" to the claimed symptoms). The ALJ also acknowledged the existence of underlying mental impairments; indeed, he found Plaintiff's depression and bipolar disorder to be severe impairments. The ALJ then found that, while Plaintiff's medically determinable impairments could reasonably be expected to produce Plaintiff's alleged symptoms, her statements concerning the intensity, persistence and limiting effects were not entirely credible (tr. 31).

In support of his decision to find Plaintiff less than fully credible, the ALJ primarily found that when Plaintiff returned to the clinic as directed, and when she took her medications as directed (including after necessary adjustments had been made to her medications), her conditions were controlled. This factor is supported by the record. In fact, the painstaking discussion of the Lakeview records, *supra*, is

Case No.: 3:16cv712/EMT

included in this order specifically to demonstrate that Plaintiff's conditions can be controlled with medications. The discussion also demonstrates that when Plaintiff ran out of her medications or did not return for follow up treatment or medication management as directed, her condition deteriorated, sometimes requiring short-term (voluntary hospitalization), but that she stabilized relatively quickly once she was back on her medications. *See, e.g.,* Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) ("A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling."); Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984) (in addition to objective medical evidence, it is proper for ALJ to consider use of pain-killers, failure to seek treatment, daily activities, conflicting statements, and demeanor at the hearing).

Secondarily, the ALJ noted that Plaintiff's daily activities, including her ability to care for and raise a three-year-old child are inconsistent with disabling limitations, as are the opinions of Dr. Danahy that Plaintiff is capable of work, as the ALJ also noted (tr. 33). These secondary findings are also supported by the record. Accordingly, there is no error, and Plaintiff is not entitled to relief on this claim.

D.    Step Five Findings

During Plaintiff's administrative hearing, the VE identified three jobs Plaintiff could have performed during the relevant period: meat clerk; stubber; and rural mail

Case No.: 3:16cv712/EMT

carrier, all of which are performed at the medium level of exertion with a Specific Vocational Preparation ("SVP") level of 2 (tr. 52–53). In the ALJ's written decision, the ALJ indicated that the VE identified three jobs Plaintiff could have performed during the relevant period: driver/helper; deliverer, merchandise; and day worker, all of which are performed at the medium level of exertion with a SVP level of 2.

Plaintiff asserts error, given that VE testimony was necessary in this case, and the jobs identified in the ALJ's decision are not the same three jobs identified by the VE. Moreover, says Plaintiff, the jobs identified in the ALJ's decision are not jobs Plaintiff can perform because they exceed her RFC (by requiring too much social contact) or because they require a driver's license and she does not have one.

It is wholly evident that the error in the ALJ's decision is a scrivener's error, and a remand in this case merely to require the ALJ to correct the scrivener's error would be a pointless exercise—an exercise the undersigned need not order and declines to order.

VI.    CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the

ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is hereby **ORDERED**:

1.      That the decision of the Commissioner is **AFFIRMED**, and this action is **DISMISSED**.

2.      That **JUDGMENT** is entered, pursuant to sentence four of 42 U.S.C. § 405(g), **AFFIRMING** the decision of the Commissioner.

3.      That the Commissioner's Motion for Extension of Time (ECF No. 14) is **GRANTED**, and the Commissioner's memorandum (ECF No. 16) is deemed timely filed.

4.      That the Clerk is directed to close the file.

At Pensacola, Florida this 27th day of March 2018.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

Case No.: 3:16cv712/EMT